MAXWELL, J.,
for the Court:
¶ 1. Damion Deandre Stokes seeks a new trial following his conviction for conspiracy to commit murder. He argues the State’s use of perjured testimony violated his due-process rights, rendering his trial “fundamentally unfair.” But after delving into Stokes’s argument, we find his actual *424 complaint focuses on the prosecutor’s comments that he personally disbelieved one of the State’s witnesses, not on perjured testimony. And Stokes waived any appellate challenge to these statements by not contemporaneously objecting to them.
¶ 2. While we find the prosecutor’s comments were improper, they did not cause a miscarriage of justice. So a reversal based on plain error is not appropriate. Because the overwhelming weight of the evidence supports the jury’s guilty verdict, we affirm.
Background

I. Discovery of Body

¶ 3. The State’s theory was that Stokes and three others hatched a plan to kill Ira Phillips because he failed to pay a drug debt. A murder investigation began after Phillips’s bullet-riddled body was discovered lying in a dark, empty gravel cul-de-sac in Panola County, Mississippi. The two men who found the body had been summoned to help Stokes and Jacquentin Lawson push Lawson’s car, which was stuck in the mud in the road leading to the cul-de-sac.
¶ 4. Because of the way Lawson’s vehicle was situated, it was necessary for the two men to drive to the end of the cul-de-sac to turn around before attempting to push out Lawson’s car. But Stokes and Lawson tried to dissuade them from driving into the cul-de-sac to turn around. When the two men did anyway, they spotted the body. At this point, the usually talkative Stokes was quiet and non-reactive, even when they turned the body over and learned the dead man was Phillips, Stokes’s friend. Lawson began picking up shell casings, but was stopped when the two men told him not to tamper with the evidence.
¶ 5. While the group was waiting for the police to respond, Stokes walked off and left. Stokes’s cousin testified that he received a call from Stokes to come pick him up near the cul-de-sac and to drop him off near Stokes’s uncle’s house.

II. Conspiracy to Kill Phillips

¶ 6. Stokes’s uncle, Vincent Ruffin, was one of the charged co-conspirators. At trial, Gary Dantzson, another charged conspirator, testified that Ruffin was a drug dealer, whom Stokes worked for selling marijuana.
¶ 7. According to Dantzson, the afternoon before the shooting, Dantzson and Ruffin were smoking marijuana together when Ruffin began complaining about someone who owed him money. Dantzson became scared because he knew he owed Ruffin money and thought Ruffin was talking about him. But Dantzson eventually realized Ruffin was talking about Phillips. Dantzson testified Ruffin offered to reduce Dantzson’s debt if he agreed to “whoop” Phillips.
¶ 8. Dantzson then left Ruffin’s house and saw Lawson across the street, putting gas in his car. Lawson asked Dantzson if he was “ready.” The two then picked up Stokes and Phillips. And the four men rode around in Lawson’s car smoking marijuana. According to Dantzson, they discussed robbing someone as a ruse to keep Phillips from suspecting he was actually the target.
¶ 9. When they reached the deserted cul-de-sac, Lawson asked everyone to get out of the car so the smoke would air out. Stokes got out of the car and walked to where Dantzson was standing. Dantzson testified Stokes slipped him a Tek-9 handgun and told him, “Unk said handle this.” Stokes then approached Phillips, and asked Phillips why he had not paid Ruffin. At this point, Phillips started to run and Dantzson shot Phillips several times with *425 the Tek-9. Phillips fell dead, and Dantzson handed the gun back to Stokes.
¶ 10. Dantzson took off running, after he, Stokes, and Lawson quickly devised a cover story to tell the authorities if questioned. Dantzson testified he later saw Stokes with the Tek-9 pistol at Ruffin’s house, where Dantzson had gone to report what had happened.

III. Murder Investigation

¶ 11. Dantzson’s trial testimony differed from what he initially told police. When first interviewed by police, Dantzson claimed there was a second car in the cul-de-sac that night, and that the fatal shots came from that vehicle. Months later Dantzson notified authorities he had lied earlier to protect himself from Ruffin. Dantzson confessed to shooting Phillips and agreed to testify about what happened that night.
¶ 12. Stokes and Lawson had also told police there had been a second car that committed the drive-by shooting. But none of the three men could specifically identify the vehicle or shooter. Nor could they match their descriptions of the car or the location of the shooter to the others’ versions of this second-car theory. According to the investigating officers, their general story was not supported by the physical evidence. There were no tire marks in the dirt and gravel indicating a second vehicle. And the shell casings were found lying on the ground in the spot Dantzson said he was standing when he shot Phillips. Had the shooter been inside a vehicle, as claimed, the casings would have likely fallen inside the car.
¶ 13. An officer further testified that the location of Phillips’s body and the blood trail leading to it corroborated Dantzson’s version recounted at trial.

IV. Stokes’s Trial

¶ 14. The State charged Stokes, Lawson, Dantzson, and Ruffin in a two-count indictment with conspiracy to commit murder and the murder of Phillips.[1] At Stokes’s trial, the State called Dantzson to testify about his and Stokes’s conspiratorial roles and to establish that Stokes had supplied the murder weapon and relayed Ruffin’s instruction to “take care” of Phillips.[2] The State also called Stokes’s uncle, Ruffin, who testified about Stokes’s connection to the murder weapon but strongly denied any role in the conspiracy.[3]
¶ 15. Anticipating Ruffin’s denial, the assistant district attorney told the jury in opening statements that he did not personally believe Ruffin was not involved in Phillips’s murder. And the prosecutor announced his plan to call Ruffin and “tell him on the stand I don’t believe him.” Then, during Ruffin’s direct examination, when Ruffin did indeed deny involvement with Phillips’s murder, the prosecutor told Ruffin, “I’ve told you from day one I do not believe you.” Once more, in closing arguments, the prosecutor repeated his personal disbelief of Ruffin’s denial of involvement.
*426 ¶ 16. The jury found Stokes guilty of conspiracy to commit murder but acquitted him of the murder charge. He was sentenced to ten years’ imprisonment, followed by ten-years’ post-release supervision. After an unsuccessful post-trial motion, Stokes timely appealed.
Discussion
¶ 17. On appeal, Stokes makes distinct challenges to two of his charged co-eon-spirators’ testimony. He first claims that, because the State did not believe Ruffin’s testimony about not being involved in Phillips’s murder, it could not call Ruffin without sponsoring perjured testimony. And second, as to Dantzson, Stokes argues the jury should not have believed his testimony, because it was self-interested, conflicting, and uncorroborated, and his conviction based on this testimony goes against the overwhelming weight of the evidence.
I. Ruffin’s Testimony — Prosecutor’s Comments on Credibility
¶ 18. Stokes argues the State could not call Ruffin because it believed Ruffin was lying about his involvement in the conspiracy. But this issue is waived, since Stokes neither objected at trial to Ruffin’s testimony nor to the prosecutor calling Ruffin as a witness and commenting that he disbelieved him. Foster v. State, 689 So.2d 1263, 1288-89 (Miss.1994) (holding failure to object at trial waives issue for appellate review).
¶ 19. While Stokes acknowledges this procedural default, he asserts his failure to object does not bar appellate review because the State’s use of Ruffin’s testimony was “fundamentally unfair” and, thus, plain error. Hurt v. State, 84 So.3d 1191, 1197 (¶ 17) (Miss.Ct.App.2009) (“A review under the plain-error doctrine is necessary when a party’s fundamental rights are affected, and the error results in a manifest miscarriage of justice.” (quoting McGee v. State, 953 So.2d 211, 215 (¶8) (Miss.2007))). But though Stokes is now suggesting the State’s use of perjured testimony violated his due-process rights, we find the actual claimed error involves the State’s assertion of its personal belief, not its sponsoring of perjured testimony. And though this trial tactic was improper, after reviewing the entire record of Stokes’s trial, we find it was harmless, since there was overwhelming evidence of Stokes’s guilt on the conspiracy count.
A. The Error Stokes Asserts — State’s Use of Perjured Testimony
¶ 20. “As long ago as Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 ... (1935), [the United States Supreme] Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with ‘rudimentary demands of justice.’ ” Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). So when a “conviction has been obtained through the use of false evidence or perjured testimony,” a defendant’s constitutional right to due process has been violated. Pearson v. State, 428 So.2d 1361, 1363 (Miss.1983) (citing Mooney, 294 U.S. at 112-13, 55 S.Ct. 340). And “[w]here such false evidence has in fact contributed to the conviction, the accused is entitled to relief therefrom.” Id. (citing Napue v. Illinois, 360 U.S. 264, 269-70, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Giglio, 405 U.S. at 153, 92 S.Ct. 763).
¶ 21. While Stokes cites Giglio, Napue, and Mooney to argue he is entitled to a new, fair trial, he admits he is not actually arguing that the State deliberately deceived the jury by sponsoring known perjured testimony. See Giglio, 405 U.S. at 153, 92 S.Ct. 763. For example, he is not claiming the State knew Ruffin was lying when he testified he had seen Stokes with a gun — the only portion of Ruffin’s testi *427 mony that remotely supported Stokes’s conviction. Indeed, if such were the case, the State’s failure to correct Ruffin’s testimony would have been a violation of Stokes’s due-process rights. See id. (holding the State’s failure to correct false evidence, even if unsolicited, violates due process). But that is not what Stokes is claiming.
¶ 22. Rather, Stokes is complaining that the prosecutor expressed his personal belief that Ruffin was lying in portions of his testimony. So what Stokes is really arguing is that the State was “inviting” the jury to believe the opposite of Ruffin’s testimony regarding his involvement in the conspiracy — not that the State used perjured testimony. In fact, Stokes has never claimed that Ruffin in fact perjured himself by denying involvement in the conspiracy. Rather, his focus is on the prosecutor’s injection of his personal subjective belief that Ruffin was lying when he denied his involvement in the murder conspiracy.
B. The Harmless Error that Actually Occurred — Prosecutor’s Improper Injection of Personal Opinion
¶ 28. “[A] prosecutor is prohibited from stating his personal opinion as to the veracity of a witness[.]” Palmer v. State, 878 So.2d 1009, 1012 (¶ 9) (Miss.Ct.App.2004); see also United States v. McCann, 613 F.3d 486, 495 (5th Cir.2010) (citing United States v. Gracia, 522 F.3d 597, 601 (5th Cir.2008)); Evans v. State, 725 So.2d 613, 673 (¶249) (Miss.1997) (citing Foster v. State, 639 So.2d 1263, 1288 (Miss.1994)). Typically, this type of prohibited statement occurs when a prosecutor attempts to vouch for or bolster a State witness by commenting in closing argument that the witness was telling the truth. E.g., Foster, 639 So.2d at 1288. But here we have the opposite — a statement made in an attempt to discredit the State’s witness, without a basis in the evidence, which is equally prohibited.
¶ 24. “Except to the extent the prosecutor bases any opinion on the evidence in the case, he may not express his personal opinion on the merits of the case or the credibility of witnesses.” United States v. Gallardo-Trapero, 185 F.3d 307, 320 (5th Cir.1999) (quoting United States v. Garza, 608 F.2d 659, 663 (5th Cir.1979)). While the State may certainly impeach its own witnesses with prior inconsistent statements and probe for bias or prejudice, it cannot lend the prestige of the district attorney’s office to profess personal opinions about a witness’s credibility. If such was allowed, jurors would likely assume the prosecutor’s comments are based on facts or evidence, known by the prosecutor but not presented to the jury. See Berger v. United States, 295 U.S. 78, 88-89, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).
¶ 25. These admonitions aside, our law is equally clear that a defendant cannot sit idly by if he or she believes a prosecutor has impermissibly stated a personal view. When a prosecutor makes a prohibited comment, “it is incumbent on defense counsel to raise a proper objection when the offensive language is uttered or waive appellate review of the issue.” Foster, 639 So.2d at 1288-89 (citations omitted) (holding the issue of improper vouching for the State’s witnesses was waived due to failure to object or raise the issue in a post-trial motion); see also Evans, 725 So.2d at 673 (¶¶ 246-47) (same); Palmer, 878 So.2d at 1012 (¶ 9) (same). And here, Stokes waived any potential challenge to the prosecutor’s comments by not objecting when they were made. So there is an obvious procedural default.
¶ 26. This means Stokes’s only available argument is under the plain-error exception to the contemporaneous-ob *428 jection rule. See Foster, 689 So.2d at 1289 (“The defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal.”). But while this exception exists, it “is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” United States v. Frady, 456 U.S. 152, 168 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).
¶ 27. We have reviewed the record from Stokes’s trial in its entirety to determine if the comments resulted in a miscarriage of justice. And after doing so, we initially note that there might well have been a strategic reason for the defense to allow these comments to go unchecked. It is unquestionably not the norm for the State to call its own witnesses liars, so perhaps Stokes’s attorney reasonably concluded the State’s credibility attack on its own witness enured to his benefit. So the comments may have indeed been welcomed, thus explaining the lack of an objection.
¶ 28. Further, even removing Ruffin’s testimony and the State’s improper comments about its veracity, several other witnesses offered strong evidence supporting Stokes’s guilt on the conspiracy count. See McCoy v. State, 954 So.2d 479, 489 (¶¶ 30-31) (Miss.Ct.App.2007) (holding no reversible error occurred due to clearly improper statements by prosecutor, which were followed by no objection, because taking away comments, it remained clear there was sufficient evidence to convict).
¶ 29. After review, we find the prosecutor’s comments, while impermissible, did not prejudicially affect Stokes’s substantive rights. See Gallardo-Trapero, 185 F.3d at 320-21 (finding prosecutor’s improper statements bolstering government’s witness “did not prejudicially affect the substantive rights” of the defendant and, thus, did not require reversal); Mack v. State, 650 So.2d 1289, 1320-22 (Miss.1994) (finding prosecutor’s repeated use of “I” statements, while improper, was harmless error).
II. Dantzson’s Testimony — Weight of the Evidence
¶ 30. Stokes next argues his motion for a new trial should have been granted because the jury’s verdict was against the overwhelming weight of the evidence. However, “the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.” Bush v. State, 895 So.2d 836, 844 (¶ 18) (Miss.2005) (quoting Amiker v. Drugs For Less, Inc., 796 So.2d 942, 947 (¶ 18) (Miss.2000)). And here, we do not find, as Stokes urges us to, that the evidence was heavily against the jury’s guilt verdict on the conspiracy-to-commit-murder count.
¶ 31. To establish conspiracy to commit murder, the State must prove beyond a reasonable doubt that Stokes agreed with one or more persons to commit the crime of murder. See Moore v. State, 105 So.3d 390, 394 (¶ 15) (Miss.Ct.App.2012) (citing Berry v. State, 996 So.2d 782, 787 (¶ 12) (Miss.2008)) (holding conspiracy count requires State to show that two or more persons agreed to commit underlying crime). Since under Mississippi law, the criminal agreement alone is sufficient to establish the completed crime of conspiracy, no overt act need be proved in furtherance of the conspiracy. Ford v. State, 546 So.2d 686, 688 (Miss.1989). And the agreement itself need not be expressed or formal. Id. (citing Morgan v. State, 741 So.2d 246, 255 (¶ 27) (Miss.1999)). Rather, the jury may infer a conspiracy from the circumstances, “acts[,] and conduct of the alleged conspirators.” Morgan, 741 So.2d at 255 (¶ 27). “[0]nce the existence of a conspiracy is shown, only slight evidence is *429 required to connect a particular defendant with the conspiracy.” Id. (emphasis added) (citing United States v. James, 528 F.2d 999, 1012 (5th Cir.1976)).
¶ 32. Dantzson testified he and Lawson picked up Stokes and Phillips with the understanding he was going to “whoop” Phillips on behalf of Ruffin. And after Lawson drove to the cul-de-sac and told everyone to get out of the car, Stokes handed him a Tek-9 pistol and instructed him that Ruffin had said to “take care of this.” At this point, once Phillips tried to flee, Dantzson shot him several times, killing him. Non-conspirator witnesses verified that Stokes was with Lawson in Lawson’s car near the cul-de-sac when Phillips’s body was soon discovered. And Stokes had discouraged those witnesses from driving into the cul-de-sac and did not seem surprised when they discovered Phillips’s dead body. Lawson then tried to pick up shell casings, shortly before Stokes left the group. And Stokes disappeared before police arrived to examine the body. Stokes’s cousin also testified he picked up Stokes near the cul-de-sac and dropped him off near Ruffin’s house.
¶ 33. When considering an objection to the weight of the evidence, we view the evidence in the light most favorable to the verdict. Bush, 895 So.2d at 844 (¶ 18). We “will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Id. (citation omitted).
¶ 34. Here, Stokes asks that we take the opposite approach and view the evidence in the light least favorable to the verdict. He urges us to be skeptical of both Dantzson’s motive for testifying against him, and the investigating officers’ reasons for pursuing him as a suspect, suggesting their impure motives preponderate against the verdict.
¶ 35. Considering Dantzson’s motive for confessing to the murder and testifying about his co-conspirator’s involvement, we find this issue was raised and explored at trial. And the weight and credibility of witness testimony was a matter for the jury to resolve—not this court. See Brown v. State, 796 So.2d 223, 227 (¶ 12) (Miss.2001) (citation omitted) (holding, in a conspiracy-to-commit-murder case, that issues of witness credibility and conflicting evidence were for the jury to resolve, not a reviewing court). As to Stokes’s other assertion—that the officers’ testimony was based on conjecture and unsupported beliefs and theories—he points to no objections that were made, let alone erroneously overruled. Thus, any evidentiary challenge to the officers’ testimony is waived. Foster, 639 So.2d at 1288-89.
¶ 36. Because the overwhelming weight of the evidence does not heavily preponderate against the verdict, we find Stokes’s motion for a new trial was properly denied.
¶ 37. We affirm Stokes’s conviction and sentence.
¶ 38. THE JUDGMENT OF THE PA-NOLA COUNTY CIRCUIT COURT OF CONVICTION OF CONSPIRACY TO COMMIT MURDER AND SENTENCE OF TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, FOLLOWED BY TEN YEARS’ POST-RELEASE SUPERVISION, AND TO PAY A FINE OF $1,000 AND $100 TO THE CRIME VICTIMS’ COMPENSATION FUND IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PANOLA COUNTY.
*430 LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, FAIR AND JAMES, JJ., CONCUR.

. The indictment originally charged conspiracy to commit murder and capital murder, but the second charge was later reduced to first-degree murder.

. After Stokes's trial, Dantzson pled guilty to manslaughter, as a reduced charge of murder. The conspiracy charge against him was remanded to the file.

.While both charges against Ruffin were later remanded to the file, there is mention during Ruffin's direct examination that he pled guilty to "threatening a witness or allegedly threatening a witness,” for which he received house arrest. Lawson, the fourth charged co-conspirator, did not testily at Stokes’s trial. He later pled guilty to conspiracy to commit murder. The murder charge against him was remanded to the file.