# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-KA-00243-COA

**CHRISTOPHER EDWARD THOMAS A/K/A CHRISTOPHER THOMAS A/K/A CHRIS THOMAS**                                    **APPELLANT**

v.

**STATE OF MISSISSIPPI**                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/06/2014 |
| TRIAL JUDGE: | HON. SMITH MURPHEY |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF CONSPIRACY TO COMMIT ARMED ROBBERY AND SENTENCED TO FIVE YEARS, AND CONVICTED OF CAPITAL MURDER AND SENTENCED TO LIFE IMPRISONMENT WITHOUT PAROLE, WITH THE SENTENCES TO RUN CONSECUTIVELY, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND TO PAY $11,000 IN RESTITUTION |
| DISPOSITION: | AFFIRMED - 11/24/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., MAXWELL AND JAMES, JJ.**

**MAXWELL, J., FOR THE COURT:**

¶1.    Christopher Thomas appeals his conspiracy-to-commit-armed-robbery conviction.

He also challenges his capital-murder conviction. He raises weight and sufficiency-of-the-evidence issues on both. After review, we find his co-conspirators' testimony, along with expert testimony and physical evidence from the murder scene, was sufficient to support the conspiracy-to-commit-armed-robbery conviction. And we find both his conspiracy conviction and capital-murder conviction were supported by the weight of the evidence. Because we find no merit to these or the other issues raised on appeal, we affirm.

**Facts and Procedural History**

¶2. On the afternoon of May 3, 2013, Taneille "Nay" Burgess had some friends over to her home in Panola County. Among those present were DeShaun "Shaun" Alexander, John "Little John" Market, LaDaron "Little Bit" Taylor, Quendravious "Bug Eye" Taylor, and Christopher "Lucky" Thomas (Chris).[1] After drinking and smoking marijuana, the five men left Taneille's house in Taneille's red jeep. They next stopped by a liquor store, then made their way to a dice game at Markes "Cat Daddy" Jones's house. Shaun and John dropped the other three men off at Markes's house and went to buy cigarettes. After picking up smokes, they returned to Markes's house but remained in the car.

¶3. Meanwhile, Chris, LaDaron, and Quendravious hung out at Markes's house. Tovell "Taco" Henderson was one of several men shooting dice. Tovell won about $1,250, and Chris lost all the money he wagered.

¶4. According to LaDaron, Chris was "mad because he lost all his money[,]" and "he

---

[1] Chris, LaDaron, and Quendravious are all first cousins.

2

wanted to rob the whole dice game." LaDaron also mentioned Chris said he was "going to get something back from Tovell." LaDaron claimed Chris decided to rob Tovell.

¶5.    After Chris gambled away his money, the five men left in the jeep. Shaun testified Chris wanted to get some marijuana, but Quendravious remembered the group going to Chris's mom's house to pick up more gambling money. LaDaron recalled there was already one gun in the jeep before they stopped by Chris's mother's home. When they arrived at Chris's mom's house, Chris went inside. Shaun saw Chris come back out to the jeep holding a big, black pistol. This gun was different from the one LaDaron said was already in the jeep. And LaDaron remembered Chris got "more money, . . . some weed[,] and another gun" before getting back in the car at his mom's house.

¶6.    The men then returned to Markes's house so Chris could continue shooting dice. Shaun and John remained in the jeep, while Chris, LaDaron, and Quendravious went back inside. About twenty minutes later, the three men came back outside with Tovell.

¶7.    Chris and Tovell left Markes's house together in Tovell's white truck. Shaun, John, LaDaron, and Quendravious hopped back in the jeep and followed Chris and Tovell until the white truck pulled into a driveway. The four men circled the block. LaDaron, who admitted he and Chris were both armed, testified he got out to see what Chris was doing because he and Quendravious planned on getting "money and dope." Quendravious got out of the jeep too.

¶8.    After dropping LaDaron and Quendravious off, Shaun and John drove around for two

3

or three minutes. Meanwhile, LaDaron and Quendravious approached the truck. Tovell was sitting in the driver's seat, and Chris was in the passenger's seat. LaDaron got in behind Tovell, and Quendravious sat behind Chris. Quendravious and LaDaron both testified they saw Chris with a gun in the truck.

¶9. According to Quendravious, Chris wanted to sell Tovell $300 worth of marijuana. But LaDaron recalled Tovell did not want to buy any weed. Quendravious testified that Tovell pulled out a wad of cash, and LaDaron jumped out of the truck and yelled, "Give me that," referring to the money. At trial, LaDaron testified he "demanded [Tovell] give [him] everything he [had]." According to Quendravious, at this point, Tovell rushed LaDaron to the ground, and LaDaron "let out one gunshot."[2] LaDaron also testified Tovell "jumped out on [him] and rushed [him] to the ground and the gun went off." LaDaron said after he shot Tovell once, he pushed Tovell off of him and grabbed $1,500 in cash[3] from him. He then ran away and heard four or five more gunshots. When Quendravious heard the initial gunshot, he too took off running. Right before he got back in the jeep, he heard more gunshots. LaDaron testified Chris was the only person still back at the truck with a gun when he heard the last four or five shots. So he believed Chris fired those last shots.

¶10. Tina Flowers lived across the street from the shooting and recalled hearing two

---

[2] In his initial statement to police, Quendravious said LaDaron shot Tovell twice. But at trial, he insisted LaDaron only shot Tovell once. According to Quendravious, the officer mistakenly wrote two shots were fired when taking his statement.

[3] Police recovered $1,087 in blood-soaked cash next to Tovell's body.

gunshots. When she asked her daughter, Paige Flowers, to look outside, Paige started screaming, "they are shooting that man!" Then, Tina and Paige heard several more gunshots and called 911. Paige saw a single shooter standing over a man on the ground. The man on the ground was not moving. Another neighbor, Ruby Henderson, was getting out of the shower when she heard five or six gunshots. When she looked out the window, she saw two men running up the road.

¶11. As Shaun and John were driving around the neighborhood, Shaun heard a total of seven gunshots with some pauses between shots. Shaun then heard someone yelling, "stop!" He saw Quendravious, followed by LaDaron, running towards them. Shaun picked up the two men in the jeep.[4] After hearing police sirens, the four men went back to Taneille's house. Chris was nowhere in sight. While en route, Shaun recalled Quendravious being very quiet, but LaDaron "was talking loud like something had happened" and hollering that "Chris had killed a man." According to Shaun, LaDaron admitted shooting Tovell twice before running off.

¶12. All the men except Chris returned to Taneille's house around 10 p.m. that night. Once there, they smoked more marijuana and drank liquor.[5] Very early the next morning, Chris called Taneille's cell phone, and Quendravious answered. Chris asked Quendravious to

---

[4] Quendravious claimed the first time he saw LaDaron with the gun was in the jeep after the shooting. Quendravious and LaDaron both testified that they had seen both pistols in the past, and that both guns belonged to Chris.

[5] Once Shaun got his car from Taneille's house, he immediately left and went home.

5

come pick him up. And Quendravious and his cousin, Jerrick Todd, went to get Chris, who had been hiding on a school bus with one of the pistols used in the shooting. Chris told the two men he hid the gun on the school bus. This particular gun was found around two weeks later by a student on the school bus.

¶13. According to Quendravious, he, John, LaDaron, and Chris divvied up the stolen money at Taneille's house that night. Quendravious also claimed LaDaron wrapped the pistol he had used in a shirt, and Quendravious hid the gun "outside[,] behind the fence line." The police never recovered this pistol. The next morning, police arrested LaDaron, Quendravious, and Chris at Taneille's house. Shaun was arrested four days later.

¶14. Chris, LaDaron, and Quendravious were jointly indicted for conspiracy to commit armed robbery. They were also charged with capital murder. Shaun was charged as an accessory after the fact. The defendants' trials were severed. And at the time of Chris's trial, none of the defendants had pled guilty or gone to trial.

¶15. At Chris's trial, several experts testified. Dr. Lisa Funte, a forensic pathologist, performed Tovell's autopsy and confirmed he suffered seven different gunshot wounds. She testified the cause of death was multiple gunshot wounds, and the death was ruled a homicide. Chad Suggs, an expert in trace evidence and gunshot-residue analysis, reviewed the gunshot-residue-kit results obtained from Chris. He found there were "particles indicative of gunshot residue" on Chris's hands and palms. Starks Hathcock, a firearms expert, testified that four of five shell casings were from a Hi-Point Model C9 9mm

6

pistol—the particular gun Chris took from the scene, which was later recovered from the school bus.

¶16.    Chris testified in his own defense.  He blamed the others for the robbery and murder. Chris claimed he panicked after LaDaron shot Tovell and picked up the pistol Quendravious left at the crime scene.  He hid with the gun on a nearby school bus until around 3 a.m. when Quendravious and Jerrick picked him up.  He admitted hiding the gun on the bus, but denied shooting Tovell with it.

¶17.    A jury found Chris guilty of conspiracy to commit armed robbery.  They also found him guilty of capital murder.  He was sentenced to concurrent sentences of five years and life imprisonment.  Chris appealed.

## Discussion

### I.    Conspiracy to Commit Armed Robbery & Sufficiency of the Evidence

¶18.    Chris first challenges the sufficiency of the evidence supporting his conspiracy-to-commit-armed-robbery conviction.  To test the legal sufficiency of the evidence, "we consider all evidence in the light most favorable to the State." *Grossley v. State*, 127 So. 3d 1143, 1147 (¶10) (Miss. Ct. App. 2013) (citing *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005)).  "Credible evidence consistent with guilt must be accepted as true." *Id*.  The State receives the benefit of all favorable inferences reasonably drawn from the evidence. *Id*.  After viewing the evidence in this light, we consider whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*.

7

(quoting *Bush*, 895 So. 2d at 843 (¶16)).

¶19.    To establish conspiracy to commit armed robbery, the State must prove beyond a reasonable doubt Chris agreed with one or more persons to commit an armed robbery.[6] *See* Miss. Code Ann. § 97-1-1(1) (Rev. 2014) (defining conspiracy as "two (2) or more persons conspir[ing] either: (a) [t]o commit a crime; or . . . (h) [t]o accomplish any unlawful purpose, or a lawful purpose by any unlawful means"); *see also Moore v. State*, 105 So. 3d 390, 394 (¶15) (Miss. Ct. App. 2012) (holding conspiracy requires the State to show two or more persons agreed to commit the underlying crime).  "[U]nder Mississippi law, the criminal agreement alone is sufficient to establish the completed crime of conspiracy, [so] no overt act need be prove[n] in furtherance of the conspiracy." *Stokes v. State*, 141 So. 3d 421, 428 (¶31) (Miss. Ct. App. 2013) (citing *Ford v. State*, 546 So. 2d 686, 688 (Miss. 1989)).  The agreement does not have to be "expressed or formal." *Id*.  Instead, the jury may infer a conspiracy from the circumstances, "particularly by declarations, acts, and conduct of the alleged conspirators." *Young v. State*, 910 So. 2d 26, 29 (¶11) (Miss. Ct. App. 2005).  "Once the existence of a conspiracy is shown, only slight evidence is required to connect a particular defendant with the conspiracy." *Stokes*, 141 So. 3d at 428-29 (¶31).  And conspiracy can be proven "entirely by circumstantial evidence." *Young*, 910 So. 2d at 29 (¶11).

---

[6] Armed robbery is: (1) a felonious taking or attempt to take, (2) from the person or from his presence, (3) the personal property of another, (4) against his will, (5) by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon.  Miss. Code Ann. § 97-3-79 (Rev. 2014).

8

¶20. The jury found an agreement to commit armed robbery had been proved. And we find the circumstances, statements, and actions of the conspirators were sufficient to support this.

¶21. After Chris lost all his money to Tovell at the dice game, LaDaron said Chris was mad and wanted to "get something back from Tovell." LaDaron also testified that it was Chris's idea to rob Tovell, and that both guns used in the robbery belonged to Chris. Quendravious confirmed Chris owned both guns. Chris retrieved a pistol from his mom's house. And the men returned to the dice game armed with two pistols. From there Chris got in the truck with Tovell, while his co-conspirators followed close behind. LaDaron admitted he and Chris were both armed. They followed Chris and Tovell because he and Quendravious planned on getting some money and dope. LaDaron and Quendravious got into Tovell's truck with Chris and Tovell. Both claimed Chris had a gun. LaDaron explained how the robbery happened—when Tovell pulled out a wad of cash, LaDaron jumped out and demanded all of Tovell's money. Tovell then wrestled LaDaron to the ground and at least one shot was fired immediately. LaDaron grabbed some cash and took off. The men later split the stolen money.

¶22. Viewing this evidence in the light most favorable to the State, we find it more than sufficient to prove Chris's participation in a conspiracy to commit armed robbery.

**II.    Conspiracy to Commit Armed Robbery & Weight of the Evidence**

¶23. Chris's next challenge is to the weight of the evidence supporting his conspiracy-to-commit-armed-robbery conviction. He requests a new trial. A motion for a new trial

9

challenges the weight of the evidence. *Grossley*, 127 So. 3d at 1149 (¶19) (citing *Bush*, 895 So. 2d at 844 (¶18)). We will grant a new trial "only in exceptional cases in which the evidence preponderates heavily against the verdict." *Id.* This court views "the evidence in the light most favorable to the verdict and 'will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Id.* (quoting *Bush*, 895 So. 2d at 844 (¶18)).

¶24. For reasons already discussed in section I, viewing the evidence in the light most favorable to the verdict, we find Chris's conspiracy-to-commit-armed-robbery conviction was supported by the weight to the evidence.

### III. Capital Murder & Weight of the Evidence

¶25. Chris also challenges the weight of the evidence supporting his capital-murder conviction.[7] Capital murder is the "killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery[.]" Miss. Code Ann. § 97-3-19(2)(e) (Supp. 2015).

¶26. As previously discussed, the evidence supported the jury's inference that Chris conspired with LaDaron and Quendravious to commit armed robbery. LaDaron testified he and Chris were both armed with both of Chris's guns during the robbery. LaDaron admitted

---

[7] Chris does not challenge the sufficiency of the evidence supporting his capital-murder conviction.

10

he tried to snatch the cash from Tovell, but when Tovell tackled him, LaDaron shot him once and ran. Quendravious also said LaDaron only shot Tovell once before they ran off.[8] Both LaDaron and Quendravious said they heard several more gunshots right before they got into the jeep. LaDaron specifically recalled hearing four or five more shots after he ran off. And Chris was the only person left back at the truck when the last four or five shots were fired. Ruby testified that she looked out the window, saw two men running, and then heard five to six gunshots, which would corroborate the evidence that Chris shot Tovell five to six times. This testimony is consistent with the autopsy evidence showing Tovell died from seven[9] separate gunshot wounds. Further, Chris's hands and palms contained "particles indicative of gunshot residue." Also telling was that when LaDaron returned to the jeep, he immediately informed the other men Chris had killed someone. Finally, Chris hid on a school bus with one of the two murder weapons until the wee hours of the next morning. And four of five shell casings recovered from the scene had been fired from the gun Chris admitted hiding on the bus.

¶27. Viewing the evidence in the light most favorable to the verdict, we find the weight of the evidence supports Chris's capital-murder conviction.

### IV. Exclusion of Co-Conspirator's Statement Based on Hearsay

[8] The evidence consistently showed LaDaron shot Tovell either once or twice. In Quendravious's first statement to police, he said LaDaron shot Tovell twice. Tina, the neighbor, said she heard two gunshots, then a long pause, and then several more gunshots. And Shaun claimed LaDaron said he shot Tovell twice.

[9] Shaun also testified that he heard a total of seven gunshots.

11

¶28.  Next, Chris argues the circuit court erred in limiting his attorney's cross-examination of Shaun, pointing to the following exchange between Shaun and Chris's trial attorney:

> Q:                         Speaking of guns, what do you know about [LaDaron] having a gun?
>
> A:                         I didn't know if he had one or not.
>
> Q:                         Did [Quendravious] tell you earlier that [LaDaron] – earlier that night –
>
> [State:]                   Judge, I'm going to object. This is hearsay.
>
> [Court:]                   Response?
>
> [Chris's Attorney:]        Your Honor, . . . [the State has them] indicted as co-conspirators.  I think anything a co-conspirator says – that's the way he's indicted it and that's the way he's got to travel.  I think it falls under the exception.
>
> [Court:]                   You're conceding that there's been a conspiracy established?
>
> [Chris's Attorney:]        No, sir.
>
> [Court:]                   Okay.  Then lay your predicate.  At this point in time the objection will be sustained.
>
> [Chris's Attorney:]        *I'll withdraw the question.*

(Emphasis added).

¶29.  Under Mississippi Rule of Evidence 801(d)(2)(E), an admission by a party-opponent is not hearsay if the statement is offered against a party and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."  In this evidentiary context, the "contents of the statement shall be considered but are not alone

12

sufficient to establish the . . . existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered[.]" M.R.E. 801(d)(2). But "before the statement of an alleged co-conspirator can be admitted as evidence, *the trial court must determine that there is preliminary evidence of a conspiracy*." *Sullivan v. State*, 749 So. 2d 983, 988 (¶5) (Miss. 1999) (emphasis added).

¶30. The trial judge was certainly aware of Rule 801(d)(2)'s dictates. He accepted defense counsel's concession that a predicate for conspiracy had not been established. So he sustained the objection until a proper predicate was laid. At this point, Chris's counsel elected to withdraw his question. And the record shows he abandoned this line of questioning by failing to pursue it later. Thus, this issue is waived.

## V.  Newly Discovered Evidence, *Brady*, and *Weathersby*

¶31. Chris filed a supplemental pro se appellate brief. In it, he insists newly discovered evidence shows he did not commit capital murder. He also generally mentions *Brady v. Maryland*, 373 U.S. 83 (1963), and claims the State withheld exculpatory evidence that his co-conspirator LaDaron killed Tovell.[10] As Chris sees it, if LaDaron had "appropriately

---

[10] Chris also cites *Weathersby v. State*, 165 Miss. 207, 209, 147 So. 481, 482 (1933), and argues his version of the facts must be accepted as true. Under the so-called *Weathersby* rule:

> [W]here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the [S]tate, or by the physical facts or by the facts of common knowledge.

13

admitted that he had in fact killed [Tovell]," instead of testifying Chris killed him, "then the jury would not have convicted" Chris of capital murder.

¶32. But what he pitches is not really newly discovered evidence. To qualify as "newly discovered evidence," there must be (1) evidence not discoverable by the exercise of due diligence at trial, (2) that is almost certainly conclusive that if discovered would have caused a different result. *In re Hill*, 460 So. 2d 792, 796 (Miss. 1984).

¶33. First, Chris has not unearthed anything new. Indeed, LaDaron testified at Chris's trial, so his testimony was not unknown. LaDaron admitted shooting Tovell, whom he claimed was still alive when he fled. And after LaDaron snatched cash from Tovell and ran, he heard four or five more shots—the gunshots he blamed on Chris. Indeed, LaDaron was cross-examined by Chris's attorney, and LaDaron's testimony never changed during Chris's trial. Still, even removing LaDaron's testimony, there was ample independent evidence supporting Chris's guilt, including other conspirator testimony, his bus-hiding episode, gunshot residue on Chris's hands, shell casings from the scene that were fired from Chris's pistol, and witness testimony about additional shots fired and two men seen running. So we find his new-evidence argument fails.

¶34. Chris also mentions *Brady*, so we consider if favorable material exculpatory or

---

*Id.* But Chris did not bring up the *Weathersby* rule as a defense at trial or in his motion for a judgment notwithstanding the verdict. So he is procedurally barred from raising it on appeal. *Page v. State*, 64 So. 3d 482, 489 (¶29) (Miss. 2011). Furthermore, his version was contradicted by other witnesses and physical evidence, so the rule is inapplicable on these facts.

14

impeachment evidence was suppressed. *Brady*, 373 U.S. at 87. Before any *Brady* violation can arise, there must be a suppression, but Chris shows none.

¶35. What Chris does mention is that after his own trial and conviction, LaDaron later pled guilty to manslaughter for Tovell's death. However, Chris has shown no evidence that LaDaron had a plea agreement in hand or was promised leniency for his testimony during or before Chris's trial. Absent evidence of undisclosed exculpatory or impeachment information, we refuse to speculate such into the record.

¶36. Furthermore, LaDaron's supposed guilty plea and colloquy are not in the record, nor could they have been, without supplementation, since LaDaron had not pled guilty at the time of Chris's trial. So it is questionable whether issues involving the later manslaughter plea are properly before us. *See Ross v. State*, 16 So. 3d 47, 60 (¶35) (Miss. Ct. App. 2009) (As a reviewing court, "we limit our inquiry to those facts contained strictly in the record, . . . not . . . mere assertions in the briefs." (quotation marks omitted)).

¶37. Chris also suggests improprieties in the firearms expert's discussion of the shell casings purportedly fired from his firearm and the gunpowder residue recovered from his hands. But like his challenge to LaDaron's credibility, these witnesses were also subject to cross-examination, and the jury was responsible for the weight and credibility given to their testimony. *See Grossley*, 127 So. 3d at 1149 (¶21) ("weight and credibility of a witness's testimony are within the sole province of the jury as fact-finder"). To the extent Chris argues the State sponsored perjured testimony, he again offers nothing more than his own

15

suggestions to support this. We thus find no error here.

## VI. Fair Trial

¶38. Chris's last pro se argument mentions a shocking device he says he was required to wear at trial. But the record shows that before trial, Chris objected to wearing the ankle security device. And the circuit judge allowed him to remove it.

¶39. The judge initially noted, "You are in civilian clothes, a brown checked tweed jacket, matching tie, black slacks, corresponding brown shoes. The pants do appear to fit you a little bit loosely and the device that is being discussed in this matter is one that is contained inside of your pants leg. It's nonvisual to anyone. And [it] is not apparent as you having any sort of restraint." As the judge appreciated it, the device would only administer a shock if the defendant tried to flee or pose a danger to someone. Until the device was brought to the court's attention, the judge "saw nothing that indicated [Chris] was wearing anything. I couldn't see anything different about his gait, how he walked, or the clothing he was wearing." But the court was concerned the jury might somehow hear an "audible signal" from the device. So the anklet was removed, with a warning that if Chris later posed "a specific danger to anyone, including [himself], that [he would] be wearing this device." Because Chris did not ultimately wear the device and there is no indication the jury saw the anklet before its removal, his claim lacks merit.

¶40. We thus affirm.

¶41. **THE JUDGMENT OF THE PANOLA COUNTY CIRCUIT COURT OF CONVICTION OF CONSPIRACY TO COMMIT ARMED ROBBERY AND**

16

**SENTENCE OF FIVE YEARS, AND CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE, WITH THE SENTENCES TO RUN CONSECUTIVELY, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND TO PAY $11,000 IN RESTITUTION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PANOLA COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR, JAMES AND WILSON, JJ., CONCUR.**