# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00665-COA

RODERICK JOHNSON A/K/A RODERICK PIERRE JOHNSON                    APPELLANT

v.

STATE OF MISSISSIPPI                    APPELLEE

DATE OF JUDGMENT:           04/08/2022
TRIAL JUDGE:                HON. JAMES T. KITCHENS JR.
COURT FROM WHICH APPEALED:  CLAY COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:    JASON D. HERRING
                            MICHAEL SPENCER CHAPMAN
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
                            BY: PARKER ALAN PROCTOR JR.
DISTRICT ATTORNEY:          SCOTT WINSTON COLOM
NATURE OF THE CASE:         CRIMINAL - FELONY
DISPOSITION:                AFFIRMED - 08/06/2024
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND McCARTY, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.    Roderick Johnson was convicted by a Clay County Circuit Court jury for the murder of James "Fluffy" White.  On appeal, Johnson argues that (1) the State made improper remarks during closing arguments, (2) his right to a speedy trial was violated, (3) the trial judge erred by admitting into evidence a map depicting cell phone data and cell tower locations, (4) the trial judge erred by admitting into evidence numerous photos and other content from his Facebook account, (5) cumulative errors require reversal, (6) the evidence is insufficient to support his conviction, (7) the jury's verdict is contrary to the overwhelming weight of the evidence, and (8) his trial counsel provided ineffective assistance.  For the

reasons discussed below, we find no reversible error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     James "Fluffy" White was killed on May 15, 2015, in Mantee, Mississippi. Roderick Johnson (Johnson), Raheem Johnson (Raheem), and Casey Watkins (Casey) were indicted for White's murder. Johnson's trial was initially set for April 2016, but his trial was continued numerous times. In 2018, Raheem was tried, convicted, and sentenced to life imprisonment for his role in White's murder. The Mississippi Supreme Court later affirmed Raheem's conviction and sentence. *See Johnson v. State*, 290 So. 3d 1232 (Miss. 2020). While serving his prison sentence, Raheem agreed to testify against Johnson, and Johnson's case finally proceeded to trial in April 2022.

¶3.     Steven "Woody" Woodruff, a former agent for the Mississippi Bureau of Narcotics (MBN), testified that prior to White's murder, White was an "extremely active" confidential informant and made undercover drug buys for MBN.

¶4.     Essie Reed lived on Dixie Road in Clay County next door to her son, Brad Reed. Essie testified that on May 15, 2015, Brad woke her up, told her that someone had been shot, and asked her to call 911. A recording of Essie's 911 call was played for the jury.

¶5.     Brad testified that White was his best friend. Brad and White were also good friends with Raheem's father, Kemp Watkins (Kemp), and Brad knew Raheem "really well." On May 15, 2015, Brad, White, Kemp, LaDesmond Shotwell, Steve Wordlaw, and Whitney Patton were all smoking crack cocaine at Brad's trailer. Around 6:30 or 7 p.m., Raheem stopped by to sell crack to the group but did not stay long. Later that night, Brad, Shotwell,

2

Wordlaw, and Patton were in the back bedroom of Brad's trailer, while White and Kemp were in the living room. Brad heard Raheem return to the house and say, "Come on, daddy." Brad assumed that Kemp left with Raheem because Brad heard Raheem's car drive away. Brad was familiar with Raheem's voice and the sound of his car because Raheem visited Brad's house almost every day.

¶6.     Brad then heard gunshots. Brad hid in the bathroom and then ran out his back door. As he fled, Brad saw that White had been shot and appeared to be dead. Brad went to Essie's house and told her to call 911. Brad testified that after the shooting, Kemp "pulled back in the yard" and picked up Wordlaw. Brad did not hear anyone else enter his trailer between the time of Kemp and Raheem's departure and the gunshots. Brad had "heard people say that [White] had a hit out on him" because "he was snitching."

¶7.     Kemp testified that White was "like a brother" to him, and White also had a good relationship with Raheem. According to Kemp, Raheem did not have a conflict with anyone present in Brad's trailer on the night of the murder. Kemp testified that he called Raheem to come pick him up sometime before White was shot. When Raheem arrived, he entered the trailer in a hurry and said, "Come on, daddy." After they left the trailer but before they were inside the car, Kemp heard "a lot of" gunshots. Kemp asked Raheem what was going on, but Raheem said he did not know and told him to get in the car. Kemp testified that after he and Raheem got in the car, a person with "a t-shirt over [his] head with the eyes cut out of it and a gun in his hand" ran out the front door of the trailer to a vehicle parked at the road.

¶8.     Kemp drove Raheem to his cousin Shirley's house and then returned to Brad's trailer.

3

Kemp went inside the trailer and saw that White had been shot and was dead. Kemp told law enforcement that he thought Jamarcus Ivy was the shooter. Kemp acknowledged that his sons, Raheem and Casey, were both indicted for White's murder. However, Kemp knew that Raheem did not shoot White because Raheem had been standing right next to Kemp outside the trailer when they heard the gunshots. Kemp also denied that he was involved in White's murder or that he knew about any plans to murder White. Kemp testified that all he knew about the shooter was that he was "tall and skinny." Kemp thought the shooter got into "some kind of white truck, a SUV."

¶9. Raquel Morgan, a records custodian for Meta Platforms Inc., which owns Facebook, testified by video deposition prior to trial, and her deposition was played at trial. Morgan testified that private chat messages sent via Facebook are stored electronically. Morgan identified a 20,876-page document as "Facebook business records" for the account name "Roderick Stay Prayed Up." The owner of the account was Roderick Johnson. The 20,876-page document consisted of account information, messages, posts, and photos from the account. A thumb drive containing the document was admitted into evidence "conditionally" over Johnson's objection.[1] The State then showed Morgan a series of thirteen poster boards of enlarged pages from the document. Morgan confirmed that the posters were identical to corresponding pages in the Facebook records associated with the Facebook profile "Roderick

_____

[1] The trial judge stated, "I assume that not all 28,000 pages are relevant. . . . So, I will allow the thumb drive to be admitted conditionally if there are specific pages other than those statements that y'all seem to be addressing. If there are other matters that you intend on showing the jury dealing with that issue, then . . . I'll have to look at those out of the presence of the jury." The parties and the trial judge have referred to the document at times as a 28,000-page document. In fact, the document consists of 20,876 pages.

Stay Prayed Up," and the posters were admitted into evidence.

¶10. Raheem testified that Kemp and White "had been close friends for a long time." Raheem denied killing White but admitted that he "had some involvement" in the murder. On the day of the murder, Raheem went to Brad's trailer to sell cocaine. Later that evening, as Raheem was leaving the County Line Store, Johnson and Quinton Naugles "flagged [him] down." At the time, Raheem had known Johnson, who lived in Tupelo, for "seven or eight months" and had "dealt drugs" with him. Johnson wanted Raheem to help him find White. Johnson said he was going to "off" White because he was "a snitch." Raheem's brother Casey then drove up in his truck. Because Johnson was unfamiliar with the area, Raheem agreed to drive Johnson to Brad's trailer, and Casey agreed to pick up Johnson from the trailer. Naugles did not want to participate in the crime and left in his car.

¶11. When Johnson and Raheem arrived at the trailer, Raheem said he wanted to get Kemp out of the trailer first and "really [did not] care what" Johnson did after they left. Raheem testified that Johnson then put on a mask, which was just "a matted up rag or something like that," and cocked his pistol. Raheem went inside the trailer to find Kemp. As Raheem and Kemp left the trailer, Raheem noticed Johnson "squatting down beside the trailer." Raheem also saw Johnson enter the trailer after he and Kemp left it, but Kemp did not notice Johnson. After Raheem and Kemp were in their car, they heard gunshots. Johnson then "ran across the yard" to Casey's black Silverado truck. Johnson got inside the truck, and it drove away. Raheem and Kemp drove to Shirley's house, but Kemp went back to Brad's trailer by himself to see what was going on. When Kemp later returned to Shirley's house, he told them that

5

White was dead and then said to Raheem, "Tell me you don't know nothing about that." Raheem lied and told Kemp that he knew nothing about the murder.

¶12.    Raheem admitted that he initially implicated Ivy in White's murder because he did not want Kemp to know he was involved in the murder. However, several days later, Raheem told law enforcement "the actual truth of what happened." Raheem, Johnson, Naugles, and Casey were all arrested. As noted above, Raheem was later convicted of first-degree murder and sentenced to life imprisonment for his role in White's murder.

¶13.    After Raheem began serving his prison sentence, he used a cell phone to contact Johnson via Facebook Messenger. Raheem testified that Johnson used the Facebook profile "Roderick Stay Prayed Up." The State admitted into evidence, without objection, thirteen exhibits of Facebook messages exchanged between Johnson and Raheem. The State then moved to admit the thumb drive with the 20,876-page Facebook document in order to show that Johnson was "controlling the profile the entire time."[2] Over Johnson's objection, the thumb drive was admitted into evidence, with the caveat that the judge would review the document before the jury was shown any additional pages.

¶14.    On June 20, 2018, Raheem sent a message to Johnson that read, "You ever think about just go on and taking that lick and we take our charges? 'Cause, bro, this 'L' on my head when I ain't pulled the trigger, just let me know what you're gonna do. I got kids and a family I'm trying to get back to." At trial, Raheem explained that he sent the message

_____

[2] The thirteen exhibits containing Facebook messages that were previously identified by Morgan and admitted by the State were contained within the 20,876-page document on the thumb drive.

6

because he thought it was unfair that he was serving a life sentence ("this 'L'") even though he did not shoot White, and he wanted Johnson to take responsibility for the murder. Johnson did not respond, so Raheem sent him another message that stated, "I ain't trying to get on the stand, bro. We've got to come . . . up with some kind of agreement." Johnson then responded, "Call me, bro." Raheem also asked Johnson to send him and his girlfriend money. Raheem felt like Johnson owed him because he was "doing a life sentence for [Johnson]" and had not snitched on Johnson. In his responses to Raheem's Facebook messages, Johnson did not deny that he played a role in the murder.

¶15. At trial, Raheem testified that Johnson shot White. Raheem acknowledged that in exchange for his testimony against Johnson, the State (via the district attorney), the sheriff, and White's family had agreed to (1) make a written request to the governor to commute his sentence to a twenty-year sentence for manslaughter; (2) if necessary, write a letter in support of his eligibility for parole at age sixty-five; and (3) consider supporting a request for him to be transferred to a different facility within the Department of Corrections.

¶16. Dr. Mark LeVaughn from the State Medical Examiner's Office testified that White's cause of death was multiple gunshot wounds and that the manner of death was homicide. LeVaughn testified that "[t]here were a total of six entry gunshot wounds."

¶17. Investigator Terry Scott of the Clay County Sheriff's Office helped process the crime scene. Scott testified that six shell casings for a .380-caliber gun were recovered in the living room. Scott later obtained Johnson's cell phone records to determine Johnson's location on the night of the murder. Johnson's cell phone records corroborated Raheem's statement that

Johnson was in Mantee at the time of the shooting.

¶18. Luz Lopez, a trial analyst and records custodian for AT&T, testified regarding records for a phone number associated with Nikki Flemings, who was Johnson's girlfriend at the time of the murder. Lopez also testified about records for a phone number registered to Johnson. The records, which were admitted into evidence without objection, included the date, time, length, caller, recipient, and "cell location" for each call. Lopez explained that the "cell location" provided the "geographical coordinates for the cell phone tower that was involved in that particular transaction."

¶19. David Walker, another trial analyst for AT&T, testified as an expert in cell tower engineering and radio access authorization. Walker explained that the cell tower locations provided in the phone records were in the form of longitude and latitude coordinates. He further explained that the coordinates provided corresponded to the AT&T cell tower, not the precise location of the cell phone. Walker explained that "each tower has its own unique coverage footprint," and in rural areas, the range of a cell tower would be around seven miles or less. Walker further testified that when a cell phone "goes from one cell tower to another, you can detect some movement."

¶20. Toby Sanford testified as an expert in geographical information systems. Sanford created a map based on the latitude and longitude coordinates in Johnson's cell phone records. In overruling Johnson's objection to the map (Exhibit 64), the trial judge found that the map was based on information in evidence and reasonable inferences that could be drawn from the evidence. The trial judge also found that arrows placed on the map, which will be

discussed in more detail below, were not unfairly prejudicial.

¶21. Sanford testified that on May 15, 2015, Johnson's cell phone communicated with a phone associated with his girlfriend, Nikki, between 1:36 p.m. and 1:55 p.m. using a Tupelo cell tower. However, beginning at 8:24 p.m., Johnson's phone communicated with Nikki's phone using a tower in Mantee. Johnson's phone also communicated with Naugles's phone at 10:29 p.m. from a Mantee tower. The communications continued, and at 10:55 p.m., Johnson's phone began using a tower in Houston, Mississippi. At 11:38 p.m., Johnson's phone again used a Tupelo tower to communicate with Nikki's phone. Sanford explained that the map he created plotted the relevant cell phone towers based on their latitude and longitude and then identified the times that Johnson's phone was using those towers. The map numbered "pings" off the towers and included color-coded arrows to show the timing and direction of Johnson's apparent travel toward Mantee and then back to Tupelo; however, Sanford testified that the arrows were only intended to depict general directions of travel, not Johnson's specific route.

¶22. After the State rested its case-in-chief, Nikki's mother, Brenda Flemings, testified as an alibi witness for Johnson. Brenda stated that Johnson was at her house when she got home from work around 2:15 p.m. on May 15, 2015, and that they "all ate dinner" when Nikki returned home around 8 p.m. Brenda also stated that Johnson did not leave for any significant period of time after dinner.

¶23. The jury found Johnson guilty of first-degree murder, and the court sentenced him to life imprisonment. Johnson filed a motion for judgment notwithstanding the verdict (JNOV)

9

or a new trial, which was denied, and a notice of appeal.

## ANALYSIS

¶24. On appeal, Johnson raises the eight issues noted above. *See supra* ¶1.

### I. Closing Argument

¶25. Johnson argues that during his closing argument, the district attorney (DA) improperly expressed his own personal opinions to bolster Raheem's testimony and credibility, argued facts not in the record, and made an improper send-a-message argument. Johnson also argues that during the State's final closing argument, the assistant district attorney (ADA) argued facts not in evidence and made an improper send-a-message argument.

¶26. However, as the State correctly notes, because Johnson "did not object to the alleged improper statements, the assignment of error has been waived and his arguments are barred procedurally on appeal." *Ambrose v. State*, 254 So. 3d 77, 129 (¶163) (Miss. 2018).

¶27. Johnson nonetheless urges us to find that the State's arguments rise to the level of "plain error." Our Supreme Court has "held that the plain-error doctrine is applied to closing arguments only when the substance of the statement is out of bounds for closing arguments." *Id.* at (¶161) (quotation marks omitted).

¶28. In general, "[w]e . . . review allegations of misconduct [during closing argument] to determine whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Ross v. State*, 954 So. 2d 968, 1001 (¶70) (Miss. 2007) (quotation marks omitted). However, we bear in mind that "attorneys on both sides in a criminal prosecution

10

are given broad latitude during closing arguments." *Ahmad v. State*, 603 So. 2d 843, 846 (Miss. 1992). "[N]ot only should the State and defense counsel be given wide latitude in their arguments to the jury, but the court should also be very careful in limiting free play of ideas, imagery, and personalities of counsel in their argument to jury." *Id.* In addition, "any allegedly improper prosecutorial comment must be considered in context, considering the circumstances of the case." *Id.*

¶29.  When, as in this case, the defendant did not object to the allegedly improper comments, our standard of review is narrower. "[T]he failure to object contemporaneously generally waives a claim of prosecutorial misconduct during closing argument," and "we will review such a claim [only] if the prosecutor's statement was *so inflammatory that the trial judge should have objected on his own motion*." *O'Connor v. State*, 120 So. 3d 390, 399 (¶26) (Miss. 2013) (emphasis added). Under the "so inflammatory standard," reversal is warranted only "in extreme cases" where there has been a "most extreme and intolerable abuse" of the wide latitude afforded to counsel during closing arguments. *Ambrose*, 254 So. 3d at 130 (¶166).

### A.    Bolstering of Raheem's Testimony

¶30.  Johnson first argues the trial court committed reversible error in allowing the prosecutor to "bolster" Raheem's testimony. "A prosecutor is prohibited from stating his personal opinion as to the veracity of a witness," which generally means that the prosecutor may not "vouch for or bolster a . . . witness by commenting in closing argument that the witness was telling the truth." *Stokes v. State*, 141 So. 3d 421, 427 (¶23) (Miss. Ct. App.

11

2013) (brackets omitted). A prosecutor "cannot lend the prestige of the district attorney's office to [his own] personal opinions about a witness's credibility." *Id.* at (¶24). "Except to the extent the prosecutor bases any opinion on the evidence in the case, he may not express his personal opinion on the merits of the case or the credibility of witnesses." *Id.* (quoting *United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999)). However, "the prosecution is entitled to argue the credibility of its witnesses after it has been challenged." *Brown v. State*, 798 So. 2d 481, 492 (¶10) (Miss. 2001).

¶31. In the present case, the DA argued, "[T]his [case] really comes down to[] Raheem Johnson, and I'm going to give you three reasons why you can trust Raheem. And . . . I'm going to save the most important reason for last." The first two reasons given by the DA were that Johnson's own cell phone records and Facebook messages between Johnson and Raheem corroborated Raheem's testimony. Johnson takes issue with the third reason that the DA argued the jury should "trust Raheem." The DA argued:

> **But the last reason is the most powerful to me. It's the most personal because I witnessed the change, ladies and gentlemen. I witnessed this person.**
>
> . . . [W]hen [Raheem] went to trial in 2018, one of my deputies . . . was trying the case against Raheem. He thought Raheem was going to testify against [Johnson] because he gave the statement. He was getting prepared for trial. He finds out from Raheem or from Raheem's lawyer that Raheem ain't going to testify. Got no plans to do it. He tries to do it – and they set up meetings.
>
> Finally, I meet with Raheem. Right before trial, I met with Raheem. I talked to him. I tried to tell him. I said man, listen to me. The law is very clear. You gave somebody a ride knowing they were about to kill somebody. That makes you an accessory. It doesn't matter that you didn't pull the trigger. It does not matter. Your own statement corroborates that. I have a strong

12

feeling you're going to be found guilty.

This is how it went, though. Man, whatever, man. I don't trust you, man. You ain't talking about nothing. Man, F-this. I'm going to trial. I brought his dad in, his mom in, brought they sisters in. Talk to this man. Please explain to him that this is a terrible decision. Man, I didn't do nothing wrong. I ain't pull the trigger. First of all, from a moral standpoint you gave somebody a ride to go kill somebody. That's wrong. Man, whatever, man. Y'all ain't got nothing. I ain't going to get convicted. Okay. Spent a long time trying to talk to him, long time. Got convicted.

To me, part of me was sad because I'm thinking this is a stupid decision. Some of these decisions these young people make, I'm confused. I'm like this is so dumb, you know. How could you be this stupid?

So, I said that's life. Choices, consequences. You know, I was going to try to get the case against [Johnson] if I could. But you know, if Raheem didn't testify, it's a very tough case. I mean, if Raheem wants to let possibly the murderer walk, and he takes the charge, and the street code is that important to him, so be it. What can I do?

But this is where I give Raheem credit. He woke up. It didn't take him long. It didn't take him long. He goes down there to prison. **I noticed from talking to Raheem. I've gotten to know Raheem.**

He goes down there in prison. He's quick to find out that that drug dealer lifestyle he had, all those people that were telling him about the street code and . . . all of that, them folks didn't put money on his books. Them folks didn't come see him. He started to realize man, this is all lies. This all a game.

Who come to see him? His mom, his daddy, his baby momma. He's seeing them struggling. Man, my momma would've never wanted me selling drugs. Why was I even doing this in the first place? I mean, he's got a lot of time alone. He's reliving.

Man, this street code stuff, man, what did it actually really do for me? What did Fluffy . . . do to me? I had no reason to participate in this murder. Why did I give this guy a ride? Why didn't I do like Naugles did, just say, man, just drop me off? I don't want to have nothing to do with this.

He started thinking about that. He started to realize man, [Johnson's] on Facebook living his life, talk about street code this and that. Man, what do

13

I care about that? I've got a son out here. Do I want my son living like me in prison on the street code? What is this going to do for me and my family?

He started to change. He started to change. So, when he reached out to me – his parents reached out to me first – I told him I said, man, ain't no good options. The law in Mississippi, it's not like you can just go and change your sentence. There ain't no good options.

And if I put you on the stand with any type of deal, I'm putting a lot on you. I mean, because you get on the stand, you try talking that street code and this and that and acting, you know, like you were when I first met you. I mean, [Johnson's] going to walk if you act like that.

**I spent a lot of time with him. He changed, ladies and gentlemen. He changed.** He remembered his momma. He remembered the people that actually cared about him, how they raised him. He was young and dumb. These people influenced him through music and quick money, not thinking about what's right and wrong. I mean, just imagine that. Giving somebody a ride to kill somebody else. You're not even thinking about that after you did that, right or wrong. That's how Raheem was in 2015. That's how he was. **But he changed. He changed.**

. . . .

So, Raheem gave a statement [in 2015]. He gets out of jail. [Casey] and [Johnson] like, man, you snitched. If you ain't snitched, we would have walked. They would have never got to us. Man, you violated code. You violated code.

[Raheem] had only been in jail six months. He hadn't gotten his wake-up call yet. In prison for a year or two, he's thinking. He thought you know what I'm going to do – Man, he feels like man, they tricking me, man. If I hadn't said nothing, they wouldn't have gotten me. So, he's doubling down. And now he's really got to try and tell Raheem, don't testify. I ain't going to. I ain't no snitch. I ain't going to get on that stand. Don't worry about it. It ain't going to happen.

So, now he's really brainwashed. **He explained to me what was going on his mind was starting to get to him** – momma, aunts, nieces, his parents. He explained to me I was down with that street life. I was brainwashed, man. I was brainwashed, but prison cleared his mind. It cleared it.

14

It taught him right from wrong. Taught him right from wrong, it did. **What you saw on that stand on Wednesday, that's not the person that I met in 2018.** That not the person. That person couldn't stand four hours of cross-examination. Yes, sir. No, sir. Respectfully. He couldn't have done it. He would have been F-you, man, I'm out of here. You know, that person couldn't have a lawyer say well, you're breaking street code right here, and him say well, I guess I am.

. . . .

**He changed, ladies and gentlemen. He changed.** And what he gets in response to that really is not no guarantees. He's getting the family of Fluffy White . . . to write a letter asking the Governor to commute his sentence. I'm going to support him. The sheriff will support him in exchange for telling him to testify truthfully.

Man, don't get me wrong, I'll be transparent. I hope after what he went through, I hope he gets commuted. But I can't guarantee it. To me, finally helping us get the person who actually murdered Fluffy, and finally breaking the street code, and understanding that people deserve justice – they love Fluffy. Finally getting that . . . it's wrong for Roderick to kill Fluffy because of a street code. Finally getting that, he deserves it.

He deserves being commuted. Going through, what he went through testifying, all of that, I never thought I would see it – all that and never lost his composure. To me, I think he earned it. Most importantly, y'all saw the change. And you saw why you can believe him. . . . I never prepped Raheem. I just talked to him. I just got to know him. And all I told him, I said, man, be yourself. Let them see the change that you went through. I think y'all saw it.

. . . .

This is good news, ladies and gentlemen. This is the smartest thing Raheem Johnson realized. This is why I'm so proud of him. He killed the street code before the street code killed him. Not everybody gets to that point. Not everybody does it. But Raheem Johnson did.

. . . .

You can trust him, ladies and gentlemen. You can trust him. . . .

(Emphasis added).

¶32. As stated above, "any allegedly improper prosecutorial comment must be considered in context, considering the circumstances of the case." *Ahmad*, 603 So. 2d at 846. Here, there was evidentiary support for parts of the DA's argument. Raheem testified that he had changed while in prison, that he had a "change of heart," and that he had come to regret his criminal lifestyle and his involvement in White's murder. Raheem also testified that he had reached out to the DA about testifying against Johnson. Based on the evidence presented at trial, the DA was also "entitled to argue the credibility of [Raheem's testimony] after it ha[d] been challenged." *Brown*, 798 So. 2d at 492 (¶10).

¶33. Nonetheless, other parts of the DA's closing argument were improper. The DA should not have argued to the jury that "the most personal" and "the most important reason" they could "trust Raheem" was that the DA had *personally* "witnessed [Raheem] change." Nor should the DA have assured the jury that they could trust Raheem because the DA had "spent a lot of time with him" and had witnessed him "change." In these parts of his closing argument, the DA improperly "len[t] the prestige of [his] office to [his own] personal opinions about [Raheem's] credibility." *Stokes*, 141 So. 3d at 427 (¶24). Accordingly, a contemporaneous objection to such arguments should have been sustained.

¶34. However, Johnson's trial counsel did *not* object to the DA's closing argument. Counsel's decision not to object may well have been strategic. The DA's closing argument emphasized just how much the State's case depended on Raheem's credibility. Raheem was a convicted felon serving a life sentence who cut a deal with the State. In addition, Raheem's testimony conflicted with his own prior statements and the testimony of other witnesses. In

his own closing argument, Johnson's trial counsel argued, "The prosecutor just spent the last 25 minutes talking to you about emotional things, feelings. But what [was] lack[ing] from that entire presentation was the facts, the facts, what happened, and who's responsible for what happened." Johnson's attorney later argued that "[t]he State [was] praying . . . that the liar, Raheem Johnson, [was] not lying" at trial. He argued that there was no reason for the jury to "believe" Raheem because Raheem had lied before and would lie "again" "if he ha[d] to." Defense counsel also emphasized that Raheem's testimony conflicted with his own prior statements and with parts of Kemp's testimony. Based on how the trial unfolded, defense counsel may well have been strategically content to allow the DA to emphasize the importance of Raheem's credibility.

¶35. Because Johnson did not object to the DA's comments, reversal is warranted only if "the prosecutor's statement was *so inflammatory that the trial judge should have objected on his own motion.*" *O'Connor*, 120 So. 3d at 399 (¶26) (emphasis added). "[I]n context, considering the circumstances of the case," *Ahmad*, 603 So. 2d at 846, we cannot say that the State's comments satisfy the "so inflammatory" standard or require a new trial.

### B. Facts Not in the Record

¶36. Johnson also argues that the DA and ADA improperly argued facts not in the record. Specifically, he argues that the DA improperly "testified himself about his own experiences" with Raheem. Johnson also takes issue with the following statement by the ADA:

> Raheem told you what happened. Raheem told you who went into the house and killed Fluffy. [Defense counsel] talked about the police finding .380 shells at Jamarcus Ivy's [house]. Well, I don't know about you, my husband has .380 shells. I know a lot of people that have got .380 shells. But those shells

17

weren't matched. Those bullets weren't matched to the shell casings that were at the house.

Again, however, Johnson did not object to these comments at trial.

¶37. "In general, [a prosecutor] may comment upon any facts introduced into evidence, and may draw whatever deductions and inferences . . . seem proper from the facts." *Ross*, 954 So. 2d at 1002 (¶74). "Counsel cannot, however, state facts which are not in evidence, and which the court does not judicially know, in aid of his evidence." *Sheppard v. State*, 777 So. 2d 659, 661 (¶7) (Miss. 2000) (quotation marks omitted).

¶38. Raheem himself testified about his conversations with the DA, his "change of heart," and his decision to testify against Johnson. The DA was entitled to comment on Raheem's testimony in his closing. To the extent that the DA's description of his conversations with Raheem went beyond Raheem's own testimony, the DA improperly strayed from the facts in evidence. However, Johnson did not object, and we cannot say that the DA's comments were "so inflammatory that the trial judge should have objected on his own motion." *O'Connor*, 120 So. 3d at 399 (¶26) (quotation marks omitted).

¶39. Related to the ADA's comments, Investigator Scott testified that shell casings from a .380-caliber gun were recovered at the crime scene and that .380 ammunition was found at Ivy's residence. However, there was no testimony that the casings found at White's house were ever compared to the ammunition found at Ivy's residence. Thus, the ADA's comments did stray from the facts in evidence.

¶40. However, the court instructed the jury that the "[a]rguments, statements, and remarks of counsel . . . [were] not evidence." The court further instructed the jury to "disregard[]"

18

"[a]ny argument, statement, or remark having no basis in the evidence." "This Court presumes that jurors have followed the instructions of the [trial] court . . . ." *Evans v. State*, 226 So. 3d 1, 26 (¶60) (Miss. 2017). Therefore, we presume that the jurors followed the trial court's instructions in this instance. We cannot say that the ADA's brief comments meet the "so inflammatory" standard or rise to the level of plain error.

### C.  Send-a-Message Argument

¶41.  Johnson also argues that the DA made an improper "send a message" argument when he argued that "the street code" should not "protect [Johnson] from . . . justice." In addition, the ADA argued that Johnson had "tried to use the [street] code to get away with murder." The ADA further argued, "Don't let him do it.  Don't let him do it.  You can't hide behind the code.  That family deserves justice.  I ask that you find it."

¶42.  The Mississippi Supreme Court has "repeatedly condemned the 'send a message' argument and warned prosecutors accordingly." *Payton v. State*, 785 So. 2d 267, 270 (¶11) (Miss. 1999). "A 'send the message' argument is one that encourages juries to use their verdict to 'send-a-message' to the public or to other potential criminals, instead of rendering a verdict based solely on the evidence introduced at the trial of that case." *Terrell v. State*, 237 So. 3d 717, 734 (¶67) (Miss. 2018) (brackets and other quotation marks omitted).

¶43.  Because Johnson did not object to the DA's comments, we review this issue only for plain error. But in any event, the prosecutors did not urge the jury to "send a message" to the public or potential criminals. Rather, they simply urged the jury to hold Johnson accountable for his own crime. *See McGrath v. State*, 271 So. 3d 437, 443-44 (¶26) (Miss. 2019). This

issue is without merit.

¶44. In summary, Johnson failed to object to any part of the State's closing arguments, and none of the comments he challenges on appeal were "so inflammatory that the trial judge should have objected on his own motion." *O'Connor*, 120 So. 3d at 399 (¶26) (quotation marks omitted). Accordingly, the State's closing arguments provide no basis for reversal.

## II. Right to a Speedy Trial

¶45. Johnson also argues that both his statutory right and constitutional right to a speedy trial were violated. Johnson emphasizes that six and a half years passed between his arrest and trial. In response, the State argues that Johnson waived his statutory right by failing to invoke it and that Johnson's constitutional right was not violated.

### A. Statutory Right

¶46. The speedy-trial statute provides that "[u]nless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned." Miss. Code Ann. § 99-17-1 (Rev. 2020). However, "a defendant waives his statutory right to a speedy trial if he fails to assert the right at any time prior to the end of the 270-day statutory period." *White v. State*, 223 So. 3d 859, 872 (¶45) (Miss. Ct. App. 2017); *accord, e.g.*, *McBride v. State*, 61 So. 3d 138, 148 (¶37) (Miss. 2011). Johnson waived arraignment in October 2015 and failed to assert his right to a speedy trial prior to his trial in April 2022.[3] Therefore, Johnson waived his statutory right to a speedy trial.

_____

[3] As we discuss later, Johnson argues that he asserted his right to a speedy trial in April 2020. We disagree. But even assuming for the sake of argument that Johnson did

20

## B. Constitutional Right

¶47. "[T]he constitutional right to a speedy trial attaches at the time of arrest . . . ." *Sharp v. State*, 786 So. 2d 372, 380 (¶15) (Miss. 2001). "Allegations that a defendant's right to a speedy trial have been violated are fact specific and are examined and determined on a case-by-case basis." *Brunson v. State*, 944 So. 2d 922, 924 (¶8) (Miss. Ct. App. 2006). To determine whether a defendant's constitutional right has been violated, we must consider and weigh "the *Barker* factors, which are (1) the length of delay, (2) the reasons for the delay, (3) assertion of the right to a speedy trial, and (4) prejudice to the defense." *Id.* (quotation marks omitted) (citing *Barker v. Wingo*, 407 U.S. 514, 529 (1972)). "[A] delay in excess of eight months between arrest and trial establishes presumptive prejudice sufficient to trigger analysis under *Barker*." *Id.* (brackets and quotation marks omitted).

### 1. Length of Delay

¶48. Johnson was arrested on October 13, 2015, and his trial began on April 4, 2022. This six-and-a-half-year delay far exceeds the eight-month threshold. Thus, the length of the delay is presumptively prejudicial and weighs in favor of Johnson. However, our Supreme Court has made "clear" that this "does not mean that *actual* prejudice to the defendant exists. Rather, actual prejudice is determined at a different point in the *Barker* analysis." *Graham v. State*, 185 So. 3d 992, 1005 (¶41) (Miss. 2016) (quoting *Johnson v. State*, 68 So. 3d 1239, 1242 (¶7) (Miss. 2011)). A delay in excess of eight months simply means that we must analyze the remaining *Barker* factors. *Id.* at (¶40).

assert his right in April 2020, he did so four and a half years after his arraignment—well beyond the 270-day statutory period.

## 2.    Reasons for Delay

¶49.    "Once there is a finding that the delay is presumptively prejudicial, the burden shifts to the prosecution to produce evidence justifying the delay and to persuade the trier of fact of the legitimacy of these reasons." *DeLoach v. State*, 722 So. 2d 512, 517 (¶17) (Miss. 1998). "[D]ifferent weights should be given to different reasons for delay." *Bonds v. State*, 938 So. 2d 352, 356 (¶11) (Miss. Ct. App. 2006). "A deliberate attempt by the State to delay the trial in order to hamper the defense should be weighted heavily against the State," but "a more neutral reason for the delay such as negligence or overcrowded dockets should be weighed less heavily." *Id.* at 356-57 (¶11). "The burden [is] on the State to articulate the reason for the delay by showing either that the delay was caused by the defendant or was caused for a good cause." *Id.*

¶50.    In this case, Johnson requested or joined in requests for fifteen continuances. All delays resulting from such continuances are weighed against Johnson. *Courtney v. State*, 275 So. 3d 1032, 1042 (¶¶27, 29) (Miss. 2019) (stating that continuances requested by the defendant and agreed continuances are weighed against the defendant). The case was continued only twice on the trial court's own motion. In January 2018, the court continued the case because "winter weather conditions . . . made it unsafe to travel." And in April 2020, the court continued the case because the COVID-19 pandemic and an administrative order by the Mississippi Supreme Court prevented the court from summoning jurors. Such delays are considered neutral and are not weighed against the State. *See Winder v. State*, 640 So. 2d 893, 895 (Miss. 1994) (plurality op.) ("[I]nclement weather constitute[s] sufficient

22

'good cause' for the rescheduling of any case for trial."); *Ward v. State*, 346 So. 3d 868, 871-72 (¶11) (Miss. 2022) ("[D]elays caused by the COVID-19 pandemic are neutral[.]"). Because Johnson requested or agreed to the overwhelming majority of the delays in the case, and the remaining delays are considered neutral, this factor weighs against Johnson.

### 3. Assertion of Right

¶51. "Although the State bears the burden to bring a defendant to trial, the defendant has some responsibility to assert his right to a speedy trial." *Courtney*, 275 So. 3d at 1043 (¶32) (quotation marks omitted). Therefore, this "factor weighs against a defendant who waits a significant amount of time after arrest to demand a speedy trial." *Id.*

¶52. Johnson argues that his demand for a speedy trial is reflected in the April 2020 continuance order related to the COVID-19 pandemic. That order stated in part, "The Defendant has rejected the [State's] plea offer and wishes to proceed to trial." However, we disagree that this statement *by the court* was sufficient to constitute a demand for a speedy trial by Johnson. Rather, the statement simply reflects the court's understanding that—after Johnson had requested or agreed to numerous continuances spanning four and a half years—Johnson had decided to go to trial rather than accept a plea. This was not a demand by Johnson for a speedy trial. Regardless, by this point, four and a half years had already passed without Johnson asserting his right to a speedy trial. Accordingly, this "factor weighs against [Johnson]." *Id.* Indeed, as the United States Supreme Court "emphasize[d]," the defendant's "failure to assert [his] right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532.

¶53. Moreover, "[w]hen a defendant moves for a speedy trial but simultaneously requests a continuance, the defendant's speedy-trial request cannot be viewed as a request to be tried promptly." *Perry v. State*, 233 So. 3d 750, 758 (¶17) (Miss. 2017). "When the putative speedy-trial demand is coupled with requests for continuances by the defense, it loses effect as a request to go to trial." *Courtney*, 275 So. 3d at 1043 (¶33). Here, although Johnson alleges that he demanded a speedy trial in April 2020, he subsequently requested or joined in requests for *four additional* continuances before his case finally proceeded to trial. Therefore, even if Johnson had demanded a prompt trial in April 2020, his subsequent requests for and acquiescence in additional continuances would have undermined that demand substantially. *Perry*, 233 So. 3d at 758 (¶17); *Courtney*, 275 So. 3d at 1043 (¶33). For all these reasons, this factor also weighs against Johnson.

### 4. Prejudice to Defense

¶54. "To determine whether the delay resulted in actual prejudice, the Court considers three interests that the right to a speedy trial was meant to protect: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Taylor v. State*, 162 So. 3d 780, 787 (¶16) (Miss. 2015) (quotation marks omitted). "Of these three interests, the last is the most important; and when violated, the most prejudicial to the defendant." *Hersick v. State*, 904 So. 2d 116, 123 (¶18) (Miss. 2004). "Generally, proof of prejudice entails the loss of evidence, death of witnesses, or staleness of an investigation." *Sharp*, 786 So. 2d at 381 (¶19). The defendant "bears the burden of showing actual prejudice, since the defendant is

24

clearly in the best position to show prejudice under this prong." *Reed v. State*, 191 So. 3d 134, 141 (¶19) (Miss. Ct. App. 2016) (brackets and quotation marks omitted).

¶55. Johnson was not incarcerated while awaiting trial. He was arrested on October 13, 2015, and posted bond the next day. Nothing in the record indicates that he was again incarcerated prior to his conviction. There is also no evidence that Johnson suffered from anxiety caused by the delay. Proof of such prejudice requires more than generalized allegations "that the delay has had negative emotional, social, and economic impacts on [the defendant's] life." *Manix v. State*, 895 So. 2d 167, 177 (¶23) (Miss. 2005). Concrete *evidence*, such as medical records or other documentation, is required. *Johnson v. State*, 235 So. 3d 1404, 1418 (¶50) (Miss. 2017). Such evidence is absent here.

¶56. On appeal, Johnson argues that "[t]here were extremely material witnesses who did not testify" and that his "alibi witness stated upon cross-examination multiple times, 'I don't remember.'" However, Johnson fails to identify any missing witnesses. Moreover, Johnson's alibi witness, Brenda, merely stated that she did not recall the ages of her grandchildren at the time of the crime. Brenda testified that she remembered the night of White's murder and was confident that Johnson was at her house that night. Johnson fails to show that he was prejudiced by absent witnesses or faded memories.

¶57. As stated above, each case is fact-specific, and we must weigh all four *Barker* factors to determine whether Johnson's constitutional right to a speedy trial was violated. There was a lengthy delay between Johnson's arrest and trial; however, that is the *only* factor that favors Johnson. Almost all of the delay was attributable to Johnson, who requested and joined in

25

requests for numerous continuances. In addition, Johnson never demanded a speedy trial and failed to show that he was prejudiced by the delay. In short, this is a case in which the "defendant [was] perfectly content to endure multiple and prolonged delays in bringing his case to trial." *Bell v. State*, 733 So. 2d 372, 376 (¶11) (Miss. Ct. App. 1999) (citing *Barker*, 407 U.S. at 521). Weighing all four *Barker* factors, we conclude that Johnson's right to a speedy trial was not violated.

### III. Admission of Map (Exhibit 64)

¶58. We review a trial court's admission or exclusion of evidence only for an abuse of discretion. *Carothers v. State*, 152 So. 3d 277, 281 (¶14) (Miss. 2014). "Unless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice . . . the accused in a criminal case, we will affirm the trial court's ruling." *Jones v. State*, 918 So. 2d 1220, 1223 (¶9) (Miss. 2005). "Furthermore, where error involves the admission or exclusion of evidence, this Court will not reverse unless the error adversely affects a substantial right of a party." *Ellis v. State*, 315 So. 3d 489, 497 (¶22) (Miss. Ct. App. 2020) (brackets and quotation marks omitted). That is, "[w]e will not reverse a conviction based on a harmless error." *Chaupette v. State*, 136 So. 3d 1041, 1047 (¶12) (Miss. 2014).

¶59. Johnson argues that the trial judge erred by admitting into evidence Exhibit 64, a map that showed the locations of cell towers used by Johnson's cell phone on the night of White's murder. Johnson acknowledges that Toby Sanford, who created the map, was qualified and testified as an expert in geographic information systems (GIS). Johnson also acknowledges

26

that the data Sanford used to create Exhibit 64—cell tower locations and times of calls to and from Johnson's cell phone—had been admitted into evidence without objection through qualified witnesses from AT&T. Nonetheless, Johnson argues that the map improperly "contained arrows identifying a path from Tupelo to Mantee and then from Mantee back to Tupelo." Johnson argues that the phone's path of travel "had not been established by any previous testimony" and that it was beyond Stanford's expertise to establish that path.

¶60. Sanford testified that Exhibit 64 was "based off the GPS coordinates provided in" Exhibit 61, which had been admitted into evidence without objection. Nonetheless, defense counsel argued the map was "prejudicial" because it included arrows showing the directions the cell phone traveled on the night of White's murder. However, Sanford testified that the arrows were only "generalized" indications of the direction the phone traveled on the night of White's murder. Sanford explained that the arrows did *not* purport to show the "specific" path the phone traveled. Indeed, the arrows did not follow any actual roads or highways. Moreover, Sanford clearly testified, "I cannot tell you . . . exactly where [the phone] was. I just know what tower it was using."

¶61. To reiterate, Exhibit 64 was based on cell phone data that had been admitted without objection, and Sanford was qualified to testify as an expert in GIS. Johnson argues that the arrows on the map were unsupported or misleading. However, Sanford's testimony made clear to the jury that the arrows did not show a "specific" path of travel but only a "generalized" direction of travel. For that limited purpose, the arrows were supported by the evidence and were not misleading. Accordingly, the trial judge did not abuse his discretion

by admitting Exhibit 64 into evidence.

¶62. Johnson also argues that he was prejudiced when, during Sanford's testimony, the trial judge "conclusively established for the jury that the phone was in fact [Johnson's] phone." Johnson cites the following exchange in support of this argument:

State:       And he stayed – and his cellphone stays in Houston for a little while during this time period?

Defense:     I'm going to object to characterization.

State:       I'll rephrase, Your Honor.

. . . .

Court:       Okay. I think the way to ask that is, his cellphone hits on a cell tower or uses a cell tower in Houston, I think is what we've agreed upon.

This issue is without merit. The phone records had previously been admitted—without objection—based on Luz Lopez's testimony identifying Johnson as the phone's user and subscriber. In light of this evidence, Johnson cannot show that he was prejudiced by the trial judge's reference to the phone as "his cellphone."[4]

### IV.    Admission of Thumb Drive (Exhibit 27)

¶63. Johnson also argues the trial judge erred in admitting into evidence a thumb drive that

---

[4] Johnson also argues the map improperly indicated that his cell phone pinged off the southeast panel of a cell tower near the murder scene, indicating that the user was somewhere to the southeast of the tower in the direction of the murder scene. However, Johnson did not object to the map on this ground at trial. Therefore, this issue is waived. *See Triplett v. State*, 264 So. 3d 808, 815 (¶25) (Miss. Ct. App. 2018) ("It is well established that 'an objection on one or more specific grounds constitutes a waiver of all other grounds.'" (quoting *Fleming v. State*, 604 So. 2d 280, 292 (Miss. 1992))). Moreover, the map's notation was supported by the un-objected-to testimony of Walker and Sanford.

contained 20,876 pages of messages, posts, photos, and other information from Johnson's Facebook account. Johnson further argues that the manner in which the evidence was admitted prejudiced him.

¶64. Johnson objected to the thumb drive, arguing that it contained many photos that were irrelevant and prejudicial. In response, the State argued that because Johnson would not stipulate that he sent the Facebook messages that Raheem received in prison, the State was entitled to introduce the thumb drive to "show that, in fact, it was [Johnson] controlling the [Facebook account] the entire time." The State also noted that the jury would only be able to view the contents of the thumb drive in the courtroom.

¶65. Prior to trial, the trial judge stated that he "assume[d] that not all 28,000 pages [sic] [were] relevant" but that he would "allow the thumb drive to be admitted conditionally." The judge stated that if Johnson objected to "specific pages" that the State intended to show the jury, then he (the judge) would need to "look at those out of the presence of the jury." During trial, the judge stated that he would admit the thumb drive "[s]ubject to the Court's rulings" and "[a]ccording to the Court's stipulations." Outside the jury's presence, the judge instructed the parties to review the document and try to agree on some "fairly calm" pages that could be admitted to show that Johnson controlled the account. The judge cautioned that if the State wanted to use any content that was "a little dicey," then he would "want to see it outside the presence of the jury . . . before [he] let it in." Defense counsel then stated that the judge "ha[d] articulated [his] reservation" and did not make any further objection. It does not appear that the parties ever actually agreed on the specific pages that could be published

to the jury. However, nothing on the thumb drive was ever published to the jury, and the jury never requested to view the contents of the thumb drive.

¶66. As stated above, we review the admission of evidence for an abuse of discretion, *Carothers*, 152 So. 3d at 281 (¶14), and "[a] trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence." *Fisher v. State*, 690 So. 2d 268, 274 (Miss. 1996). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the case." MRE 401. But "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." MRE 403.

¶67. The records on the thumb drive were relevant because they tended to show that Johnson controlled the Facebook account "Roderick Stay Prayed Up" and exchanged relevant messages with Raheem. Indeed, at trial, defense counsel stated that he "wouldn't be objecting" if the State had offered a smaller selection of photos "with [Johnson's face] or whatever." Therefore, the trial judge did not abuse his discretion by finding that the document on the thumb drive was relevant in whole or in part.

¶68. To the extent that the document included content that was irrelevant or unduly prejudicial, the issue is moot because no such content was ever published to or viewed by the jury. On appeal, Johnson argues that he was prejudiced because the jury heard the DA argue—in response to Johnson's objection—that the State "believe[d]" that the contents of the thumb drive would "show that, in fact, it was [Johnson] controlling the profile the entire time." However, as explained above, the document or part of it *was* relevant and admissible

30

for that purpose. Under the circumstances, we cannot say that Johnson suffered any prejudice from this comment or that the trial judge abused his discretion.[5]

## V. Cumulative Error

¶69. Johnson argues that he is entitled to a new trial based on "cumulative error." *See Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss. 2007) (discussing the "cumulative error doctrine"). However, Johnson has not identified any error at trial. Therefore, the cumulative error doctrine is inapplicable. *Morris v. State*, 303 So. 3d 9, 22 n.3 (Miss. Ct. App. 2020).

## VI. Sufficiency of the Evidence

¶70. Johnson argues that the State presented insufficient evidence to convict him. When we "review[] the sufficiency of evidence supporting a guilty verdict, we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017). "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements." *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010). "Rather, we must affirm the conviction as long as there is sufficient evidence for a rational juror to find that the State proved its case." *Carson v. State*, 341 So. 3d 995, 1000 (¶9) (Miss. Ct. App. 2022).

---

[5] On appeal, Johnson also asserts that the document "contained untold hearsay." However, this argument is waived because Johnson fails to develop it with citations to the record or authority. *See Doss v. Claiborne Cnty. Bd. of Supervisors*, 230 So. 3d 1100, 1104 (¶10) (Miss. Ct. App. 2017) ("In the absence of meaningful argument and citation of authority, an appellate court generally will not consider an assignment of error. A cursory argument without further reason or explanation is inadequate." (citation, quotation marks, brackets, and ellipsis omitted)).

¶71. Here, Raheem testified that he drove Johnson to White's house to murder White and that he heard gunshots as soon as Johnson entered White's house. Johnson's own Facebook messages and cell phone records corroborated Raheem's testimony. This and other evidence was sufficient for "rational jurors" to find Johnson guilty of first-degree murder. Therefore, the trial judge did not err by denying Johnson's motion for JNOV.

## VII. Weight of the Evidence

¶72. Johnson also argues that he is entitled to a new trial because the jury's verdict was against the overwhelming weight of the evidence. When we review the denial of a motion for a new trial on this ground, we "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.* In addition, we review the trial judge's decision to deny a new trial only for an abuse of discretion. *Id.* at 292 (¶21).

¶73. The jury obviously found Raheem's testimony—corroborated by Johnson's Facebook messages and cell phone records—to be credible in material respects. Johnson presented an alibi witness, but it is the jury's role to assess witnesses' credibility and weigh and resolve conflicts in the evidence. We cannot say that the jury's verdict was contrary to the overwhelming weight of the evidence. Therefore, the trial judge did not abuse his discretion by denying Johnson's motion for a new trial.

## VIII. Ineffective Assistance of Counsel

¶74. Lastly, Johnson argues that his trial counsel provided ineffective assistance by failing to object to the prosecutor's closing arguments. "[G]enerally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Dartez v. State*, 177 So. 3d 420, 422-23 (¶18) (Miss. 2015). However, "[t]his Court will address such claims on direct appeal when . . . the record affirmatively shows ineffectiveness of constitutional dimensions, or . . . the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020) (brackets and quotation marks omitted). We may also address such "claims on direct appeal when the record affirmatively shows that the claims are without merit." *Id.* If the record on direct appeal is insufficient to address such a claim, we deny relief without prejudice to the defendant's right to present the claim in a properly filed motion for post-conviction relief (PCR). *Johnson v. State*, 196 So. 3d 973, 975 (¶8) (Miss. Ct. App. 2015).

¶75. Here, as discussed above, Johnson's trial counsel may have had strategic reasons for not objecting to the State's closing argument. In addition, we cannot say that "the record affirmatively shows ineffectiveness of constitutional dimensions." *Ross*, 288 So. 3d at 324 (¶29). Accordingly, we decline to address this claim on direct appeal. We do so without prejudice to Johnson's right to raise the issue in a properly filed PCR motion.

## CONCLUSION

¶76. Johnson's conviction and sentence are **AFFIRMED**.

33

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**